We're happy to hear argument in our first case, number 138021, Prieto v. Clarke. Mr. Raphael? Good morning, Your Honor. May it please the Court, Stuart Raphael, for Director Clarke and the other Virginia Corrections officials here. After the 1984 breakout from Mecklenburg State Prison where six death row inmates escaped, Virginia changed its policy to prevent those type of incidents from happening in the future. Virginia's current policy segregates death row prisoners in very secure facilities at Sussex One State Prison, death row move from Mecklenburg to Sussex One. In this case, the plaintiff, Alfredo Prieto, claims that he should be given the opportunity to be subjected to it. Your Honor, so you said this is after – when did you change the policy? It was after Mecklenburg in 1984. 1984. That's correct. And so the policy you have is still the same policy. The district court issued an order in this case. It was a state – have you done anything since then? Is the court's question, what have we done with regard to the order that's been – If you don't comply with the district court's order. The plaintiff was interested in our not appealing that immediately to this court. The record does not reflect exactly what has been done, and I hesitate to go outside the record to answer the court's question. But ostensibly you've complied with the district court's order. Well, we've satisfied the counsel for Prieto that what we're doing is sufficient to not have to bring the issue to the court's attention. But I'm not asking for the specific nature of the changes. As I understand it, the district court's order went to the question of whether you had afforded due process rights under the 14th Amendment. The outcome could be the same. You could come out and still have the same conditions, everything. But the question is, from my perspective, has the state undertaken procedures to comply with the court's order to implement due process rights under the 14th Amendment? I'm not talking about the specific things you've done, but due process is what I'm talking about. Yeah, Judge Winn, the order that the trial court entered was a two-pronged one. It said either allow Prieto to be subjected to the individualized placement rules that are used for non-death row offenders, or soften the conditions on death row so he's not subjected to a significant and atypical hardship. The court said we could do either or. We have not revised the procedures because that would require a wholesale change in the regulatory rules that are used pending appeal. But we have reached at least an understanding with counsel for Prieto that some of the, with regard to some changes in his conditions on death row, so he's satisfied that we're in compliance with the order. The due process procedures that you have in place, when we look at the Wilkerson case, the Supreme Court talked about the liberty interest there and the implication of due process procedures. What are the due process procedures here? As I understand, when this case was brought, it was automatic. You're on death row, you automatically go here. So there was nothing in between that afforded due process the notice of anything. That's correct. Death row, those who were sentenced to death are categorically assigned to death row. That procedure has not... Well, in your response to my colleague's answer, he asked you if there was nothing in between the sentence, I take it, the death row sentence, was what triggered this. Is that correct? That's correct. That's exactly right. And the process that is due is the process that is afforded as part of the criminal trial and the conviction that leads to a death sentence. Why didn't the Supreme Court say that in the Wilkerson case? There had to be some process due to those who were in maximum security that during the trial itself, you would know where you're going. I think there are really two issues embedded in that. First is, do you still have to look at the state law to create the liberty interest? We say you do. We don't think Sandin or Wilkerson eliminates that requirement. And it's undisputed... That's clear that you do. The Supreme Court says there's no liberty interest under the 14th Amendment. You've got to look at the state. That's correct. And it's undisputed in this case that Virginia law does not create a liberty interest in being housed other than on death row because the regulation says if you're convicted of a capital offense, you go to death row. That's the law. So, there's no state law interest that's created different from that. It looks like the court has said that state property, I mean, liberty interest is, arises from the different conditions that you're subjected to. Isn't that what the language looks like? I understand how some people have misread it that way, but if you look at... You're welcome. I mean, that's what the language says, doesn't it? Well, no, Your Honor. You sure about that? Yes. When you read Sandin... You might say that's not what the language means, but doesn't the language say that? When you read Sandin carefully, it is clear the court is not eliminating the requirement that the liberty interest be created by state law. It consistently talks about a state-created liberty interest as it does the court in Wilkinson. The Second Circuit read it that way. It applies a two-pronged approach, looking first, does state law create the interest, and second, looking at the atypical and significant hardship test. Judge Motz... I'm sorry. Go ahead. You go ahead. Your opinion in Williams v. Benjamin in 1996, the year after Wilkinson came out, applied the two-factor analysis. You looked at what did state law create with regard to the rights in question, and was it atypical and harsh? So is it your submission that there could be no atypical and significant hardship, even if... Let me put it this way. Even if there was an atypical and significant hardship, if there was no process, no state process that was violated, there would be no constitutional violation? If the premise is that nothing rises to the level of a constitutional violation, that's... Take my... I understand your answer, but take my question. In other words, there is something that we would all agree is atypical and significant hardship, but there is no state law or state regulation that has been violated. In other words, the state has it in its hands. I understand. To make what regulations it wishes, and it makes the harshest possible regulation. The first question is, what's the benchmark? You can't determine what... That is another question, and I'll give you that, and I'd be delighted to know your answer to that one, too, but I'd like the answer to this question, too. Your first question is, could you have a constitutional violation, and you need to distinguish between an Eighth Amendment violation and a due process violation. Okay. No. I beg your pardon, then. I mean only a due process violation. The answer is, if state law does not create the liberty interest, you could not have a due process violation. In the best case... So, if under Virginia law, everybody that was sentenced to 20 years in prison got solitary confinement, and there was no provision for going up or down, and that was the law, that would be... That would not violate due process. It might be an Eighth Amendment violation. Well, I think that that case would be controlled by Meacham and Sweet. Meacham held that Massachusetts did not... All right. Let's make it 10 years. Well, I think my answer is the same. Meacham looked at... Okay. Let's make it three years. Well, Your Honor, Meacham... If I can finish the answer. Sure. Sorry. Meacham says that in looking to whether state law created a liberty interest in not being sent to a maximum security facility, Massachusetts law didn't create any entitlement on the part of any prisoner not to go to a maximum security facility, and it dismissed the due process claim. Wilkinson said... Sandin says, we want to go back to the law of Meacham and Wolfe. Well... So, you could... Right? So, your answer is no. Is that right? There's no due process? That's correct. Under the law... Sweet is another good example where this court held on bank in 1975 that indefinite solitary confinement does not by itself violate the Eighth Amendment. There might be other things that added on top of that could constitute an Eighth Amendment violation, but indefinite segregation did not. Let me then go back to what you raised, which is, what is the baseline? If the general prison population is the baseline, you lose... If the general prison population is the baseline for death row prisoners, and you disagree that you still have to look to state law, then I think... Well, what's the answer? What's the answer? She asked you a question. What is the answer? I can't answer it yes or no, Your Honor, because it depends on those two things. If we lose that you still have to look to state law, you don't think we have to look to state law. Let me ask you a question, maybe you can. When you look at a death row prisoner, what's the baseline against which you compare the conditions of the death row prisoners? Other death row prisoners, and the best case for that is Austin versus Wilkinson. Let me ask you this, Wilkinson. This is... I think I'm reading this correctly for Wilkinson. After standing, it is clear that the touchstone of the inquiry into the existence of a protected state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions, but the nature of those conditions themselves, quote, in relation to the ordinary incidents of prison life. Now, I'll read that again for you. It is clear that the touchstone of the inquiry into the existence of a protected state-created liberty interest is the nature of those conditions themselves in relation. So that's the language. Doesn't that language indicate you look to the conditions? You have to read it in context, Your Honor. If you look earlier in the opinion, the court says at page 222 that the court has held that the liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations subject to the important limitations set forth in Sandan. It's not doing away with the requirement that there be a state-created liberty interest. If that were true, the court would have federalized the inquiry. Let me ask you this. What is the process for a non-death row convict? What does the state do? Do they just... Do they have a hearing for that person, or do they just do a paper calculation? There is a procedure that is used to categorize the prisoners. I'm asking you, do they have a hearing where the person shows up, or do they just do a calculation looking at the person's offense and all that? I don't recall specifically if there's a hearing. I would need to check that in the record. How do you decide where somebody in Virginia goes, and what kind of... There's a scoring system which is described in the briefs. The other point... In that scoring system, does it provide points for the offense? I believe it does. Well, then... The other answer... Then why isn't a point a total for a death penalty case? Why wouldn't that be sufficient in the calculations? Because... Well, first of all, the scoring system doesn't have anything to deal with death row... I know. Why don't you just change it? Well, that's the issue. I know, but I ask you, why don't you? Because... Isn't that effectively what you do? Because the Supreme Court has told us that federal judges are supposed to defer the judgment of prison officials unless... No, I'm not saying that much. Listen to my question. Yes, Your Honor. Isn't that effectively what Virginia does? They put a 99. They give you a point total for death row. Don't they, in essence, give enough points for a death penalty case that it pushes you into this confinement all the time? Yes, consistent with the categorical approach that death row inmates go to death row. The issue here is, should federal courts substitute their judgment for the professional judgment of state prison officials? Well, that's not the issue. Absolutely, it's the issue, Your Honor. It is not the issue. Now, my question is, is there any relief that's even possible or necessary because you already do it? You don't like that question? I'm sorry. We don't... This question really helps you think about it. I know that. You're biting me, I think. Somebody, I don't think you understand my question. My question is, I know you want to talk about what federal courts can and can't do, and I may agree with you down the line, but that's not the question I'm asking you. If the other side is seeking some individualized assessment, isn't that, in effect, what Virginia gives them now? It's just they assign a point total to death penalty that's going to put you in the highest category. Well... You don't agree with that? No, no. I'm just saying the present... The creator didn't take that position. He said that there might be some different number assigned, but it can't be a 99. It can't be such that it leads to a categorical assignment. I do think that one of the core issues here is deference to state officials, because there was ample testimony in this case that prison inmates or death row inmates are different from general population offenders. You can't go to death row unless a jury has found either that you pose a significant risk of future dangerousness or that the crime was particularly vile. So they are... Is the core of your argument deference to state officials and death is different? That's the... Death penalty is different. Yes, as to the first part of our argument. Our second argument is that you still have to look to state law. The Second Circuit has said that. Hiranda lower courts in this case have said that. And it's clear when you look to state law that there isn't a state-created interest here. And the third point is what's the baseline? And there's been no published case to date that says that the baseline for death row is other death row prisoners. Austin v. Wilkinson is the perfect example. That's the case on remand from Wilkinson. The district judge said, looked at a prisoner who wanted a transfer from one death row facility to another in Ohio. And he said, I'm not going to compare it to the general prison population. I'm going to compare you to other death row inmates. And there's no difference. And that... So determining whether there's a state-created interest, you do have to take your definition of what a baseline is here, right? I think they're different inquiries. The first question is, does state law create the interest? And the second is, if it does, then Sandin wipes out insignificant and trivial claims. When you read Sandin, written by... That's a nice roundabout way of going to answer my question, but I think we're assuming that we have to find a state-created interest here. My question is, in making that determination, do we have to accept your definition, which is sort of Judge Marx's earlier question, that I still need an answer to in terms of the baseline. You go to Wilkinson, and you look at the facts in Wilkinson, and what you have is a set of conditions that, as Judge Shedd has alluded to in that little paragraph that Senatee read to you, it's the nature of the conditions, not the regulations that control. And if you go there, and you look at that, you see those conditions in Wilkinson, and you put them right beside the ones here, it's basically the same thing. And the difference being is, in that case, you're dealing with life without parole in a super-max sort of situation, but the Supreme Court says itself, it sort of ducks the baseline questions. It says, well, we're not going to get to it, but it doesn't matter, because under any baseline, under any baseline, this is harsh. But under that scenario, using that, how do you limit the consideration of baseline in the determination of a liberty interest? These are legal arguments. We're not talking about the actual conditions. I can't emphasize that enough. We're not getting into, and that's what my initial question was, which sounds like to me, that's where the order has been put in place. But I think the basis of what we're here for is a determination of whether the 14th Amendment due process rights are implemented here, implicated here, and to the extent that you have done anything to afford due process rights, outcome can be exactly what it is. But there's got to be some due process rights. And if the baseline is beyond death row, as the Supreme Court in Wilkinson said, it didn't matter in that case. They said under any baseline, this would apply. What is the response to that? How do we get there? A couple of points, Your Honor. First of all, we don't believe Wilkinson does away with the requirement to look for a state law graded interest. And the difference in Wilkinson was, the difference in death row. And I know you've set your argument that way. Agreed. You have to have a state graded interest. But to get it. The question, the reason we're having this conversation is because that's not the issue in this case. The issue is, what do we do to determine there's a state graded interest? And the baseline you use is prisoner, death row prisoner, death row prisoner, which is not Wilkinson. That's something that's being created here today or a determination we would have to make. Wilkinson says under any baseline, it would be harsh. The difference, Your Honor, is Wilkinson involved general prison population, prisoners sent to Superman. Identical type situations of what's conditions, because it's the nature of the conditions. Wilkinson said, not the regulation, not the designation of the prisoner as a death row versus one with life without parole. Because life without parole, basically you're not going anywhere either. You basically have nothing to lose. You're going to die in prison. In Wilkinson, they lost parole credit. In Wilkinson? In Wilkinson, they lost parole credit if they were sent to Superman. But it wasn't limited just to those few prisoners who lost parole credit. I mean, it wasn't limited just then. No, but the court said that that was a significant factor in finding a state graded liberty interest. The other point, Your Honor, is Wilkinson does that state. That the loss of parole is a significant factor in finding a liberty interest. You'll get a chance to come back. Why don't you tell us when you come back? It's at page 2395 of the Supreme Court. For now, it said, well, any of these conditions standing alone might not be sufficient. Taken together, they impose an atypical incident of hardship, and they were referring specifically to the prior sentence. Placement disqualifies an otherwise eligible inmate for parole consideration. Thank you. Thank you. Mr. Byrne? Thank you, Your Honor, and may it please the Court, Michael Byrne for Mr. Prieto. The only question on appeal to this Court is whether the district court correctly concluded that Mr. Prieto has established a liberty interest in avoiding permanent assignment to conditions of solitary confinement that are equivalent to or more severe than those that the Supreme Court unanimously found to be so harsh and to impose such extreme isolation that they gave rise to a liberty interest as compared to any plausible baseline. Now— Where does your claim get his liberty interest? Sure. So, the liberty interest— I think, I know you do it directly from the 14th Amendment, but you didn't argue that below. So, let's find a procedural due process right somewhere else, somewhere in state law is usually where we look for it. Sure. Although, certainly, this Court can affirm the judgment below on any grounds supported by the record. So, I do think that it's that question. All right. I'm just trying to give a little preemptive strike to not talk about that right now. Thank you. Yeah. So, I think in looking to what is that issue in Stanton and Wilkinson, what is the purpose of that test, and how did they create a baseline? I think what the Court has said is that in looking to whether a state-created liberty interest is at stake, you look at two things, which are both a function of state policy. One is, what are the ordinary incidents of prison life? And then, second, what are the conditions into which that inmate is placed? And the reason why you do that— So, what gives your client a right, the right he's seeking? Right. Well, so— You know, the 14th Amendment, all you have here is a due process claim, and you have to have an underlying right to get your process forth. No, that's right. And I think that— And, you know, I searched the state regulations, the state statute. I can't find anything that he could— There were things in the Wilkinson case. There was a whole array of regulations that they could latch onto. Okay. So, I agree. That's an important question, and I think— And so, what's the answer? Okay. So, I think, first of all, if you look at the analysis in Wilkinson, and in this Court's decision in February— Just answer it. Where do you find the state-permeated property, I mean, liberty interest? It's where? It's from the ordinary incidence of prison life, and let me give an example that I think is helpful. Suppose that— That's the same sentence Judge Shedd said earlier. I mean, it seems like to me that's being ducked on both sides here. No, no. I think we absolutely agree with that statement, which is that what the Supreme Court said is that to apply the Sandin standard, we look to whether the conditions, the conditions at the Ohio State Penitentiary impose an atypical and significant hardship in relation to the ordinary incidence of prison life. And when the Court then proceeds— So, you don't think there has to be an independent from the conditions, regulation, or state interest somehow created? I think that the ordinary incidence of prison life is what creates the state interest or actuation, and this is why the— That exists separate and apart from any regulation or statute. Well, the— And because we don't have a regulation or statute. Well, what's relevant when we're talking about state regulations or statutes is the state regulations or statutes that are setting up the conditions, not the process. Do you point to anything other than the conditions themselves that create a liberty interest? No, but it's the conditions which are the product of— And let me explain. So, suppose that tomorrow— Yeah, but you say the state creates the conditions, and therefore that's your liberty interest, your view of what your rights are vis-a-vis those ordinary conditions. That's right. So, suppose that tomorrow Virginia took me out of free society and placed me into prison. Does your theory make every Eighth Amendment claim a due process claim as well? No, not at all. Why wouldn't it? Well, so, a procedural due process claim is quite different than an Eighth Amendment claim. Well, I know that. Yeah. Well, and you know that the reason why that is is because an Eighth Amendment claim, you would be— we would be arguing— Why wouldn't it be this way? I have an Eighth Amendment claim, cruel, unusual punishment, and that— what I see as cruel and unusual punishment is also different than the conditions of the ordinary person in prison. And so, therefore, I have both claims. Well, but a procedural due process violation is rarely going to rise, and I think Virginia is a— Now, you didn't answer my question. I said, under your theory, doesn't an Eighth Amendment claim also give rise to a due process claim? Well, you can always make a procedural due process and an Eighth Amendment claim if you're challenging conditions of confinement, but I think it's— I don't know. I'm not asking what you can make. Trust me, I know lawyers can make any kind of claim. I'm not asking that question. I'm asking, isn't there a legal basis every time you make, under your theory— and your theory may be right— but under your theory, every time you have the basis for an Eighth Amendment claim, don't you also have the basis for a due process claim? Although that due process may have been satisfied, but wouldn't it create both claims? Well, I think the only issue I would take with that is that it might be the case— suppose that Virginia were to place all inmates into conditions that would violate the Eighth Amendment. In that circumstance, you wouldn't have a state-created liberty interest because the baseline that the state had created would itself be consistent with what each individual— But if one prisoner got one favorable treatment, you could at least make a culpable claim. Well, no. It would be the converse. So if you had a system where the vast majority of inmates were maintained and let's say the general population— No, I'm backing out to what your claim is to get a hearing on it, get some kind of court case. You could make that claim, couldn't you? You could make a claim if your conditions of confinement impose an atypical and significant hardship in relation to the ordinary incidents of prison life, yes. I don't want to get too far afield, but I want to make it clear because I think I do understand your argument is the conditions themselves, the existence of the conditions themselves alone is the only state liberty interest you're arguing. But the conditions are the function of state regulation. I didn't add that in. But yes, that's right. There is no state regulation or policy here that is violated. All you're relying on is the conditions. Well, that's right. Okay. Is there any other case that's done that? Well, I think Wilkinson itself holds that. No, no, no, no. I'm sure that you've gone and read also the Supreme Court, the oral argument in Wilkinson, but it's perfectly clear that there was a concession there and the court was very cognizant of what Ohio law provided. And what Ohio law provided were a bunch of regulations that assertively were violated. So Wilkinson really doesn't stand for you can have a procedural due process right just on the basis of conditions. Well, I would disagree with that for a couple reasons. So first of all, I think this would be helpful. You would agree with me that Ohio did have these regulations. Ohio had regulations, but it's not those regulations which gave rise to the liberty interest. Okay. So again, to take an example, suppose that tomorrow the state removed me from free society and placed me into prison. You would know that a liberty interest was implicated in that case without knowing anything about the Commonwealth's justification for placing me into prison or what regulations or process the Commonwealth afforded me before they placed me into prison. It's the conditions themselves, that difference in conditions, which gives rise to the liberty interest. Now, the question of what process is set out by the regulations is relevant to the second part of the procedural due process inquiry, which is whether the Commonwealth has afforded adequate procedures to Mr. Prieto in taking away the liberty interest. But the liberty interest comes from the comparison of conditions itself. And Wilkinson is quite clear about this. If you look to where Wilkinson finds a liberty interest, what they say is they discuss several harsh conditions at the Ohio State Penitentiary, and they say, as we discussed, while none of those conditions standing alone would give rise to a liberty interest, taken together, they impose an atypical and significant hardship. It therefore follows. Right, but it was the parole, it was a bunch of other things that were in the regulations. I don't think so. I don't think it's the regulations that afforded the process that gave rise to the liberty interest. Okay, so Wilkinson is the case that you, and the only case that you would say that has this procedural due process right, even if there's no state regulation, statute, or policy. But just to be clear, I think there are relevant state regulations, statutes, or policies. It's just that the relevant state regulations, statutes, and policies. Well, you can't point to one that says that imprisoning your clients has been violated. But in all procedural due process cases under Wilkinson, there's no violation of the state policy. The argument is that the policies that are provided are insufficient. And so, the relevant state regulations. Your argument is the state regulations are law, is that law which creates the conditions in place. That's exactly right. So, there's a state policy which says someone who's sentenced to death is going to be assigned to permanent solitary confinement. Has there been a case where this right has been recognized where there wasn't some kind of change in status, or requested change in status? Wilkinson itself. So, Wilkinson was a class action, and the court's opinion is quite clear that among those in the class were individuals who were assigned directly to the Ohio State Penitentiary. And the way Ohio's system worked is that you were assigned a number from one to five, and if you were assigned to five, you went directly into the Ohio State Penitentiary. So, I think that Wilkinson itself forecloses the argument that really all that's going on here is you're looking for a change in conditions. Let me ask this. What is it that you want? You want for your client, you want a hearing, an individualized assessment, or a result? In other words, a change in these conditions. Which is it that due process requires in your opinion? It's just an individualized assessment. So, all Mr. Creative… Let me ask you this. Why hasn't the state done that? Can't the state assign points? You just mentioned Ohio, but if that's all you want, hasn't the state de facto done that? Okay. So, I appreciate Your Honor's question to my friend. Well, I'm interested in you now. Well, and I'm happy to answer it. So, the number that they give, which is a 99, it's undisputed in the record that that number is arbitrarily picked, and it's not intended to denote an actual assessment of… I said de facto. What if they go back and they say, okay, we're going to solve your due process problem. We think the death penalty case, it's so hard to get a death penalty. They're findings beyond a reasonable doubt and all of that. We're going to give that person a 99. We're going to give that person a 99. Based on that, why can't they do that and solve your individualized assessment issue, which you say you want? So, I think if the Commonwealth were to address this in good faith, I think it would be difficult for them to do that because their own director of offender management explained that if someone who was sentenced to death was genuinely eligible for different conditions, it would be inappropriate to send someone to jail. But what about if they just pass a state law that says, the state laws de facto do that, I think. What if they pass one that say, we had this lawsuit, to solve it, here's the remedy, their lawyer said they asked for an individualized assessment. We hereby make it part of Virginia law that when a person goes through the rigors of a death penalty trial and is convicted, they ought to be assigned 99. You got your individualized assessment because you, as opposed to everybody else, or most other people, you get 99 points. Well, I think you have to distinguish between two things. So, I mean, obviously, if Virginia were to say, solitary confinement is going to be punishment for... Why couldn't they do just what I said? Right. That would be what you asked for. Except that if they did just what you said, it would run straight into the line of Supreme Court cases that's discussed in Blandon v. Klein, which is a 1971 case, and there are others going back, which say that... So, the net result of that is not correct, you just want an individualized assessment. You want something more than an individualized assessment. Well, but I don't think you're talking about an individualized assessment. If they're an individualized assessment that can only have one possible answer, then it's an irrebuttable presumption. No, no, no. You have an in-seeing jury finding you, or the judge, whatever, whoever does, finding you qualified for the death penalty, that, in and of itself, gets you this kind of imprisonment. That's the individualized assessment. I'm hypothesizing. Sure. That's what Virginia said. So... What would be wrong with that? So, several responses. First of all, we know that in this case, that... So, they've made the argument, for instance, that there are particular jury findings that are made before someone is given a death sentence, but we know that that's not actually happening. Okay, but let's just hypothesize. Sure. And you're going with Judge Shedd's hypothesis. Right. So... I'm sorry, give me the hypothetical again. Well, we have a jury that has all kinds of findings about your... and gives your client the death penalty. Because... All manner of findings. Because I think it's an apple-to-orange comparison, because what a jury's being asked to do when they're asked to give a death sentence is, to decide between death and life, is what's the appropriate punishment for the crime that's been committed? It's a retrospective look. Why couldn't the state bridge that gap? All kind of so-and-so, and they say, that's exactly right. You have all kind of facts and mitigating and other circumstances. As a decision by the state, that's all interesting, but we know what it takes under the law to get to that conviction, and that conviction gets you an offense point total. Except that what the department said, and this is very clear in the record, and I would encourage the court to look at... I said, why can't they do that?  Sure. Why can't they? If we were on a completely different record, then maybe they could make that judgment. No, I'm asking about your theory. Wouldn't that suffice to give you an individualized assessment? Well, only if it's a genuine assessment. I think if it's not... Well, I just gave you what the assessment is. Right, but if you're giving me a 99, and there's no chance that I can have any other outcome, then it's an irrebuttable presumption case. And again, under Vlandis' decline, 412 U.S. at 446, what the court said is, statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clause, and a statute creating a presumption, which operates to deny a fair opportunity to rebut it, violates the Due Process Clause of the 14th Amendment. In the normal process, I asked the other lawyers, they didn't quite know. In the normal process for a drug dealer in Virginia, do they get a point total for their crime? They do. So it's a holistic assessment. You get a point total for your crime, your sentence. So why can't you get a point total? Not you. Why can't your client get a point total? You may feel like you're facing the firing squad. No, no, quite right. Not meant to be. But why can't the state just decide a point total that is allocated to death penalties? That's all we're asking the state. And that's 99 points. Except that I think, again, the – well, no, but I do think this is important. Oh, no, no, but I think that undercuts your argument that all that you want is an assessment. You want an assessment that has factors like you want them to be rated. No. That's not right? I don't think so. And again, I think the reason is there is a difference, I think, between an assessment that is a genuine assessment where you're looking at all the different criteria that the Commonwealth uses for everything else and an assessment where you're just looking at sentence. And the reason for that is that – Yeah, but don't some people in the prison get a higher offense level than others? And that's fine here. We're not saying that the Commonwealth can't give a higher point total. They just can't give it so high you don't like it? No, no, no. They can give it high so that I don't like it. But it has to be something that meaningfully gives you an opportunity to have a holistic assessment. And the reason for that is that Director Clark's own testimony in this case, and I encourage you to look at J625, 626, says, is classifying someone based on sentence alone appropriate and sufficient? No, it's not sufficient. And that's why the Commonwealth has individuals in maximum security prison who are serving sentences for driving on suspended license while they have other individuals who are serving multiple capital murder sentences that are in less restrictive conditions of confinement. But I would have to read the context. I trust you were there and some of you can fill this in. I was. But sufficient could be, yes, that would be the high end, but you could put in other factors if you were lower because of the crime that would up your ante. Is that what he was saying? Well, but that's all we're asking. All we're asking for – Well, no, because in other words, he's saying that the crime itself could get you the base. No, no. And then you could get up from that, but not down. No, no, no. Well, the specific question is, is it appropriate to classify just based on an individual's sentence? So it wasn't directed to people that had been found guilty of murder and received life sentences. The Commonwealth doesn't – The question was not directed to that. Well, no, no. The Commonwealth doesn't classify individuals who have capital murder convictions and have life without parole just on the basis of their sentence, and that was encompassed within the question. Well, was encompassed in the question people that received the death penalty. I'm sorry? Was encompassed in the question people that have received the death penalty. Well, obviously the – I mean, I think we were talking as a general matter, and I – Indeed. Okay, so that brings us back to Judge Wynn's question in the very beginning. So what is the baseline here? I think that the appropriate baseline is what the Supreme Court has said. I think they mean what they say when they say the ordinary incidents of prison life. Well, tell me. I do think it's the general population. Okay, now when you say that that's what the Supreme Court said, where do you get that? Well, so I think this Court has said that the general prison population – Well, let's talk about the Supreme Court right now. Sure. We like them first, then ourselves. Understood. So I think the Supreme Court – We asked Judge Moss not to make that comment. But he did. So I think what the Supreme Court said, and importantly in Wilkinson, is that there was a liberty interest implicated under any plausible baseline, and so necessarily they had to exclude certain baselines in order to reach that conclusion. Earlier in our dialogue, I asked you if you had read the oral argument transcript. Did you? I did at some point, yes. And it's pretty clear that they do not feel that way, at least some of them. Isn't that correct? I don't think so. And in any event, I would take the opinion for what it says. Well, the opinion says that the state isn't making that argument, that there's a concession. What the opinion says is that the state originally did not take that position. It's gone off and on. Right. They were a bit schizophrenic. But in the end of the day, the court realized that it needed to reach the determination of whether there was liberty interest. And I think what's important about Wilkinson is Wilkinson was a class action that included individual sentence to death. So my friend is wrong that – Whether there was liberty interest, but it didn't reach the question about what the baseline was. Right. Because that's the problem that all the lower courts are struggling with, because it didn't do that. But because the court – And it wasn't a death penalty case. Are you aware of any other death penalty case where this has been an issue? Wilkinson – one of the named class plaintiffs in Wilkinson was sentenced to death. And that's clear from the record. The only argument you have on that case is that Wilkinson ultimately ducked that question. But it did say, if you look at the conditions there, under any baseline, this is too harsh. So that's the only thing you can get from the Wilkinson case. Let me return to Judge Shedd's earlier question in terms of what if the state were to allow for this to be implemented at the stage of the trial. And it seems to me that really goes to the question of, could the state implement a punishment that would include this with the exclusion of other inmates? In other words, for death penalty, individuals would be sentenced, and the sentence would include these conditions under state statute. And we would take no issue if this was a punishment. But that's essentially what that is. It's essentially the state saying, well, you will be sentenced to death, and you will be put under these specific conditions as a condition of your sentence. As a condition – right. And that essentially would not offend notions of due process? Well, no. I mean, I think if you're talking about an additional punishment, it's different. Because, again, you have to – Would it offend sentence of due process, or would it not? That's the question. No, I think if you're just talking about – Well, then you answer Judge Shedd's question. It has to be yes. Forget the 99. Why not just make it the punishment? Because I do think that there's an important difference if you're talking about a statute that were to say that this is going to be – Oh, you know we're just talking about hypothetical. This is not your case right now. No, I clearly understand. What if the state did this? Well, but this is important. So in Enri Medley, which is one of the Supreme Court cases we know from 1890, it was very much that situation where Colorado changed its statute to make it so that you went to solitary confinement before a death sentence. And in that case, there was no question that it was punishment. The court found an ex post facto violation as it was applied to the prisoner at issue there. But that's a different type of circumstance than this, where the state has said – Believe me, we know it's different. What we're trying to do is tease out what is at issue here. And it seems to me what you're doing is encouraging – it's a bad incentive. What you're trying to do is to get the state to make the very harshest possible laws. Because then there is no due process claim. I think it's quite the opposite. All we're asking for in this case is the same basic opportunity to be heard and individualized assessment that the department affords every other inmate. And it takes one to three hours. Why don't you answer? Yeah. Well, no, but I think – I don't think it would have existed in 1890 or whatever. There wouldn't be a due process violation, would there? Yeah, but punishment is different than when you're talking about conditions of confinement. No, and I think that this is borne out in the case law. There's no question that in Wilkinson, if it was part of those individual sentences that they were to go to the Ohio State maximum security prison, I don't think there would be any argument under Wilkinson.  And there is an atypical and significant hardship in relation to the ordinary incidence of prison life that is imposed by those conditions. In those cases, the state has to afford due process. And the due process that's at issue here is going to very seldomly result in a due process violation. Because take Virginia, for instance. In Virginia, the vast majority of inmates are managed within the general population consistent with the ordinary incidence of prison life. For every other inmate other than individual sentenced to death, when they're taken out of the general population, they're afforded a formal due process hearing. Now almost for credo, so this is the rare case where you have extremely severe conditions for a long duration with no adequate process. And in those rare circumstances, we think that a right exists under the 14th Amendment. Thank you very much. Mr. Ruffio? I think there are three issues in the case. The first issue is, is it appropriate for Virginia prison officials to conclude that death row inmates are different as a category, that they are more dangerous and pose more of an escape risk, and therefore categorically should be assigned to death row? And on that issue, the law is clear under Florence and the other cases, cases by this circuit, that you have to defer to the judgment of correctional officials unless the record contains substantial evidence that their policies are an unnecessary or unjustified response to problems of jail security. And there's no evidence in the record to overcome that judgment. We cited in our papers all of the testimony by the Director of Corrections Department. He's got 40 years of experience of why death row inmates are different. The second issue, and Judge Motz, you just nailed it. The second issue is, what do Wilkinson and Sandin do with regard to the inquiry? Are there still two inquiries? Do you have to show a state law interest on number one? And number two, does it have to be a serious enough one so it rises to the level of an atypical and significant hardship? On that issue, the Second Circuit got it right in Frazier. Judge Graham got it right in the Chappell opinion in the Ninth Circuit. This is not clear in the Supreme Court. I grant you that. And that's why this case is so important. When this court writes the opinion in this case, what we would respectfully ask the court to do is make clear that both of those prongs are required. In some instances, a trial court is going to be able to dismiss a claim as a relatively frivolous claim. Sandin gives some examples, like the prisoner who didn't want to have to eat a food loaf or who wanted a cell that had electrical outlets or who wanted a tray lunch instead of a bag lunch. In those cases, the atypical and significant hardship prong is going to get rid of the case. In other cases like this one, where there's no state-created liberty interest, this case would have gone out had that been the clearly established rule. And we're asking this court to say that trial judges have discretion as to the order in which they apply those factors. The Supreme Court, you know, they write opinions. They write great opinions, of course. But in describing the Sandin case, everything you said we could probably go along with except that sentence Judge Shedd read earlier is still starkly there. It says that it's not the language of the regulation regarding those conditions, but it is the nature of the conditions themselves in relation to the interest. And, Your Honor, you can't take a sentence without looking at the entire case. I think Judge Motz is right about this. I mean, he didn't just take it out of the case. It says after a sentence. This is not in context with it. It is clear. It's what the Supreme Court said. So you don't need to look anywhere else when you say it is clear. They said it is clear. This is what we've done. But I think, Your Honor, when you look earlier in the opinion, it's what is clear. And I understand you can look earlier, you can go back in context, but when the Supreme Court says it is clear, we've got to take them at their word that it is clear. And not fuzz it up by saying, well, we can go back and look and see. Bottom line is, is this really a difficult thing for the State of Virginia to do? Is it as difficult as it seems for 10 or 12 inmates to afford them due process under the 14th Amendment for which the end result may well be the same thing, or to take the step that Judge Shadd has suggested, and that is to have a State statute of whatever enacted that would create a baseline of 99 or so. Is that – why is that? Your Honor, Virginia believes that death row offenders are so dangerous and pose such an escape risk that as a categorical matter, they should be sent to death row. And those would be considerations that would come up in a due process hearing. No, Your Honor, the due process is provided by the trial that sent them to death row. It's just like Justice Scalia described in the Connecticut case. But that same process in the trial would also have been the due process that it would have been in the Ohio State Penitentiary case. No. The Supreme Court didn't say that. And I'm not disagreeing with it. It sounds like to me it could come from there too. But it didn't come from there. And those conditions that are listed there are conditions that the court found would give rise to liberty. Now, I think in Wilkinson it did come from state law, as Judge Motz explained. It came from the fact that the court – Well, there's some indication the Ohio State conceded, but the United States – And that's important too. Amicus brief said, no, we're not conceding. And then they get to the argument and the justices say, well, it looks like they're backtracking. And then that's where the court takes off on the sentencing review and then ends up seeing this blanket statement here. You have to look specifically at the part of the opinion where the court explains why there's a state law liberty interest. And one key component of it was that the prisoners would lose parole time if they – parole credits. You don't think – That's right. Supermax. You don't really think that the challenge to what you do in Virginia is going to end with just a hearing, do you? Well – You don't think that, do you? That's correct. But then if you gave them a hearing or any kind of individualized assessment and you assigned a point total that shows the seriousness with which the state commonwealth takes that conviction, you anticipate then that hearing will be challenged. Or they'd be challenged that they don't have the right to rebut it. You don't think – it sounds good to say just a hearing solves it, but the state doesn't think that, do they? That's correct. And Prieto's counsel said that at page 813-15 of the Joint Appendix, where the testimony was that if you scored Prieto without accounting for his death sentence, he would score a 25 and he'd be eligible for a Level III facility. And they said it would be disingenuous if we did anything significantly more severe than that. The district court ruling here would fundamentally alter death row in Virginia and disregard the professional judgment of Virginia's correction officials about the dangerousness and escape risk of death row inmates. This court should reverse. Thank you very much. We will come down and greet the lawyers and then go directly to the next case.
judges: Diana Gribbon Motz, Dennis W. Shedd, James A. Wynn, Jr.